Anthony CROSBY–BEY, Appellant,

v.

DISTRICT OF COLUMBIA, a Municipal Corporation, et al.

No. 84–5930.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 15, 1986.

Decided March 28, 1986.

Michael Evan Jaffe, Appointed by this Court, with whom David L. Kelleher, Washington, D.C., was on brief, for appellant.

Richard B. Nettler, Asst. Corp. Counsel, with whom John H. Suda, Principal Deputy Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief, for appellees.

Before GINSBURG and SILBERMAN, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion PER CURIAM.

PER CURIAM:

This case grows out of Anthony Crosby-Bey's confinement in Lorton Reformatory, a prison operated by the District of Columbia Department of Corrections. In May of 1984, prison officials removed Crosby-Bey from the general prison population and placed him in administrative segregation, apparently because he had been involved in a fight. While in administrative segregation, officials charged Crosby-Bey with three disciplinary violations. He was found guilty in each case. As punishment

for these transgressions, prison officials revoked some of his privileges.

Crosby-Bey brought this *pro se* action against the District of Columbia and various prison officials, all of whom are appellees in this action. Crosby-Bey claimed that the appellees had violated his constitutional rights as well as the prison regulations set forth in the Lorton Regulations Approval Act of 1982 ("LRAA"), Act 4–224, 29 D.C.Reg. 3484 (1982). Shortly after the District Court appointed counsel to represent Crosby-Bey, the appellees moved for summary judgment. After considering the opposition filed by Crosby-Bey's counsel, the District Court granted summary judgment for the appellees and dismissed the case. Crosby-Bey appeals.[1] We affirm.

The regulations governing housing and discipline at Lorton allow officials to place a resident in segregation for either disciplinary or administrative reasons. If a prisoner is found guilty of committing a disciplinary infraction, he may be penalized. Possible sanctions include loss of good time credits, disciplinary segregation, and extra duty assignments. Prison regulations give inmates certain procedural protections before conviction, including prompt investigation, written notice before a hearing, procedural rights at the hearing, and a written decision. Even if a resident is not charged with a disciplinary infraction, he may be confined to administrative segregation if prison officials find that the inmate is a danger to others, is in danger himself, or poses a definite escape risk. Prison regulations provide for procedural protections regarding administrative segregation. These include notice, a hearing, and a review of the segregation every thirty days.

Both disciplinary segregation and administrative segregation involve a substantial loss of liberty for the prisoner.[2] Disciplinary segregation, however, is more restrictive because prisoners lose privileges that are generally available to them while confined in administrative segregation. Prison officials confined Crosby-Bey to administrative segregation for four months and placed him in disciplinary segregation for part of that time.

■ We review first the prison administration's decisions to hold Crosby-Bey in administrative segregation. The initial decision to segregate the prisoner on May 8, 1984 has already been held lawful. *Crosby-Bey v. District of Columbia*, No. 84–5930 (D.C.Cir. Mar. 7, 1985) (per curiam). We thus review only the decisions on June 8 and July 2 to keep Crosby-Bey in administrative segregation.[3]

On June 8, the housing board held its first thirty-day review of Crosby-Bey's administrative segregation. We assume, *arguendo*, that in part because Crosby-Bey had been convicted of several disciplinary infractions while confined to administrative segregation, the board did not allow him to return to the general prison population. On July 2, the board again reviewed his segregation. Finally, in September of 1984, the board released Crosby-Bey back into the general prison population. Crosby-Bey argues that these decisions to keep him in administrative segregation are invalid because he had no notice, the proceedings were not recorded, and the board did not set forth its findings in a written memorandum.

Periodic review of administrative detention is required to ensure that administrative segregation is not a pretext for indefi-

---

1. We appointed the counsel who served Crosby-Bey in the District Court to continue his representation on appeal. We here note, and express our appreciation for, counsel's diligence and the high quality of his written and oral presentations.

2. Because appellees do not dispute the point, Appellees' Brief at 6 n. 5, we assume that the prison regulations which are the subject of this litigation create a constitutionally protected in-

terest in remaining in the general prison population and in enjoying the privileges that were revoked in this case. *See Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983).

3. Although Crosby-Bey was confined until September 5, none of his amended complaints challenges the subsequent decisions of the housing board.

nite segregation. *Hewitt v. Helms*, 459 U.S. 460, 477 n. 9, 103 S.Ct. 864, 874 n. 9, 74 L.Ed.2d 675 (1983). This review, however, need not rise to the level of a formal hearing. In *Hewitt*, the Supreme Court expressly addressed precisely this point:

> This review will not necessarily require that prison officials permit the submission of any additional evidence or statements. The decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner—which will have been ascertained when determining to confine the inmate to administrative segregation—and on the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for "proof" in any highly structured manner. *Id.*

Moreover, in making administrative detention decisions, prison administrators are entitled to rely on " 'purely subjective evaluations and on predictions of future behavior.' " *Id.* at 474, 103 S.Ct. at 873 (quoting *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981)).

We need not decide what constitutional minima are required for a periodic review. On June 8 and July 6, the housing board reconsidered both the original reason for segregating the appellant—his involvement in a fight—and apparently his unruliness while segregated. Crosby-Bey has not produced any evidence that the decision to keep him in administrative confinement was a pretext or any evidence that the decision was not made pursuant to justifiable prison administration goals.[4] Prison officials could well conclude that the danger presented to or by Crosby-Bey was still operative, and that this danger was exacerbated by Crosby-Bey's continued failure to obey rules and to respond to authority. The decision to keep a prisoner in administrative segregation is based in part on "officials' general knowledge of prison conditions and tensions." *Id.*, 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9. Since this information is peculiarly within the grasp of prison administrators and "singularly unsuited to 'proof' in any highly structured manner," *id.*, prison officials need not set out with particularity their findings that the inmate still presents a risk; nor must they hold a formal hearing when reviewing a decision to continue administrative segregation. The Supreme Court rejected precisely this requirement in *Hewitt. See also Clark v. Brewer*, 776 F.2d 226, 234–35 (8th Cir.1985) (nonadversarial hearing each thirty days). Seeing no substantial evidence of bad faith or pretext on the part of prison officials, we find that the procedures followed in this case satisfied the Constitution.[5] *Cf. Mims v. Shapp*, 744 F.2d 946, 953–54 (3d Cir.

---

4. There is evidence in the record that prison officials were concerned with Crosby-Bey's psychological state as well as his injuries and disciplinary record. *See* Davis Deposition, Record Doc. 39, at 41–42, 64–65.

5. We note that the memorandum of decision in the original administrative segregation hearing held May 8 indicated that Crosby-Bey's status would be reviewed during the week of June 3. Defendants' Motion for Summary Judgment, Record Doc. 23, Exhibit C. Similarly, the June 8 rehearing document indicates another rehearing would be held during the week of July 2. Davis Deposition, Record Doc. 39, Exhibit 1. *See* LRAA § 207.1. A prison officer gave deposition testimony indicating that Crosby-Bey received copies of these documents. Davis Deposition, Record Doc. 39, at 43–45. Crosby-Bey does not deny this allegation. Since appellant knew that rehearings would be held during the weeks of June 3 and July 2, *cf. Clark v. Brewer,*

776 F.2d 226, 234 (8th Cir.1985) (fact that hearings are regularly scheduled constitutes sufficient notice), he had ample notice to avail himself of his right to submit new evidence. *See* LRAA § 207.4. There is no indication that appellant submitted any new evidence on his behalf. Moreover, appellant never availed himself of his limited right to request a review from the board by specifying new evidence or circumstances that would justify a change in his housing status. *See* LRAA § 208. Given appellant's failure to present any evidence that his segregation was unjustified, we will not second-guess the prison administration. *See Bell v. Wolfish,* 441 U.S. 520, 548, 99 S.Ct. 1861, 1879, 60 L.Ed.2d 447 (1979) (" 'in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response ... courts should ordinarily defer to their expert judgment in such matters' ") (quoting *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974)).

1984) (thirty-day review, without notice or opportunity to appear, can satisfy due process).

■ Crosby-Bey next challenges his disciplinary sanctions, arguing that since his hearings on May 14, 21, and 29 resulted in disciplinary segregation, he is entitled to the due process protections outlined in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). In our March 7, 1985, Order, we specifically noted that Crosby-Bey had raised this issue and we requested counsel to address it.

*Wolff* requires advance written notice of the charges at least twenty-four hours prior to the hearing and a written decision explaining the reasons for confinement. *Id.* at 563–64, 94 S.Ct. at 2978. But "disciplinary segregation" is not a talisman that automatically concludes the due process analysis. The requirements of the due process clause are flexible and must be analyzed in the context of the particular claim. Indeed, we must look to the *nature* of the interests at stake, both private and governmental, in order to determine the process due. *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976).

This is not a case in which prison officials have deprived a prisoner of an arguably protected liberty interest by removing him from the general prison population and placing him in segregation. Instead, prison officials here have replaced lawful administrative segregation with disciplinary segregation. This change in status did lead to a loss of privileges. The privileges Crosby-Bey lost, however, are minor given his already extremely restricted environment— confinement to a control cell with only two hours per week of recreation. Because of his disciplinary segregation sentence, appellant directly lost only the right to have a radio, the right to smoke, the right to have items purchased at the prison canteen, and the limited right to participate in prison work and educational programs. *Compare* LRAA § 201.4 *with* LRAA §. 105.4. Crosby-Bey *may* also have an interest in avoiding both the stigma associated with a disciplinary sanction and the speculative effect of a disciplinary sanction on prison officials' future administrative segregation decisions. These interests, however, do not approach the interests at stake in *Wolff v. McDonnell*—stigma plus deprivation of good-time credits. Yet the process provided to the appellant approaches that required by *Wolff.* Appellant was given at least oral advance notice of the hearings [6] and he does not claim that lack of written notice impaired his ability to meet the evidence against him. Moreover, appellant cannot complain that he does not know the rationale of the disciplinary decision when the board heard uncontradicted evidence against him and appellant provided no evidence on his own behalf. To satisfy the constitutional minima, the board need not repeat in a written opinion the evidence set out in an officer's charge or investigative report, evidence appellant did not dispute, despite an opportunity to do so. Since the prison's procedures closely approximate the *Wolff* requirements and appellant's interests are of significantly less magnitude than those at stake in *Wolff,* we hold that the due process balance tips in the District of Columbia's favor.[7]

---

**6.** Appellant charges that an affidavit submitted by the District of Columbia in support of its motion to dismiss was later repudiated by the affiant. Appellant urges us to accept this repudiation as evidence that he was not informed of charges arising out of the May 17 incident. Appellant's Brief at 10, 30. But the affiant, Officer Vincent, repudiated the affidavit only to the extent that it implied Vincent had personally informed Crosby-Bey of the charges. Vincent testified that "either another sergeant or a lieutenant probably served the [disciplinary report]" on Crosby-Bey. Vincent Deposition, Record Doc. 40, at 77–72. Moreover, the disciplinary report itself shows that Crosby-Bey initially signed it, thus indicating that he had been shown the charges. *Id.,* Exhibit 3; *see also id.* at 72.

**7.** Even assuming that a disciplinary violation could serve partially as the predicate for further administrative segregation, our result would be unchanged. One might speculate that the same acts that form the basis of a disciplinary violation could be seen by prison officials as evidence of a safety risk and thus a reason for administrative segregation. For example, appellant's inability to respond to valid exercises of

We thus affirm the District Court's holding that the procedures offered appellant in this case meet the constitutional minima.

 Appellant also contends that by violating its own regulations, the District of Columbia has necessarily violated the Constitution. He cites as support for this contention cases holding that federal agencies must follow their own regulations. *See, e.g., United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). These cases, however, do not establish this principle as a constitutional doctrine, *Vitarelli v. Seaton*, 359 U.S. 535, 547, 79 S.Ct. 968, 976, 3 L.Ed.2d 1012 (1959) (Frankfurter, J., concurring and dissenting) (a "judicially evolved rule of administrative law"), and we reject the invitation to extend them to administrative procedures within the District of Columbia government. Agencies of the District of Columbia must follow the local Administrative Procedure Act. *See* D.C.Code Ann. § 1–1501 et seq. (1981 & Supp.1985). Violations of that Act, however, do not by their own virtue raise a federal question. *See* 28 U.S.C. § 1364 (1982). Moreover, the District of Columbia is not bound by federal statutory administrative law, 5 U.S.C. § 551(1)(D) (1982), and this court has held that the District of Columbia and its agencies are not within the purview of other general federal laws. *See, e.g., Cannon v. United States*, 645 F.2d 1128, 1137 (D.C.Cir.1981) (federal government generally not liable for District of Columbia agencies under Federal Tort Claims Act). Thus, we hold that Lorton's violation of its own regulations does not, in and of itself, violate federal law. This does not mean we condone the prison administration's cavalier attitude toward the rule of law within the prison. We simply hold that these "distinctively local controversies" are more properly raised in the District of Columbia courts. *Palmore v. United States*, 411 U.S. 389, 409, 93 S.Ct. 1670, 1682, 36 L.Ed.2d 342 (1973).

The District Court's grant of summary judgment in favor of the appellees and order dismissing the case is affirmed.[8]

*It is so ordered.*

authority may well make him, in the prison administrators' professional judgment, a security risk and thus a danger to himself and others. In light of the uncertain connection between disciplinary segregation and later administrative segregation, we hold that the process given appellant in this case was sufficient to withstand constitutional attack.

**8.** On the day the District of Columbia moved for summary judgment in this case, appellant moved to amend his complaint by adding distinct causes of action. The District Court accepted this amendment, but in granting appellees' motion for summary judgment, the court ordered "that this *case* shall stand dismissed." Record Doc. 42 (emphasis added). Appellant never urged the District Court to deny the motion for summary judgment on the ground that the amended complaint raised new issues of disputed fact. *Cf.* Record Doc. 35 at 1 n. 1 (noting, without argument, the existence of the amended complaint). Moreover, appellant never properly raised any contention on this point before this court. Thus, we deem any claim of error on this score waived.